THE STATE v. H. A. NASH.

*Assault with Intent to Rape—Conviction for Simple. Assault— Punishment—Trial—Instructions.*

1. Upon an indictment of a physician for an assault upon a seventeen-year old girl, in that he took indecent liberties with her person, an instruction that "if he acted in good faith, as a physician, and did what he did as such, he is not guilty, otherwise he is guilty," is erroneous, in that she may have consented to the liberties, knowing his want of good faith.

2. Where there was a serious conflict between the testimony of the prosecutrix and that of the defendant, it was erroneous to restrict the jury to either the theory of the State or to that of the defendant, as they may predicate their finding upon an hypothesis not consistent with either theory.

3. In an indictment for an assault, with intent to commit a rape, upon conviction for a simple assault, the punishment is restricted to a fine of fifty dollars or an imprisonment of thirty days, in the absence of "*serious injury*," which must be such physical injury as gives rise to great bodily pain; mental anguish alone is not *serious injury* within the purview of the statute.

This was an INDICTMENT for an assault with intent to commit rape upon one Susan Goss, tried at the July Term, 1891, of the Superior Court of GRANVILLE County, before *Winston, J.*

The defendant is a physician, and had been called in the evening to attend a brother of the girl upon whom the assault was charged to have been committed. The brother lived about one hundred yards from the house of his father, where the girl lived. The defendant complained of being tired and wet, and sadly in need of rest, while at the son's house, and the mother of the girl offered the defendant the use of her bed, in which she and her husband usually slept, in a room adjacent to that occupied by her daughter Susan, and the offer was accepted.

The defendant testified that the mother informed him that her daughter, the prosecutrix, had injured herself by running on the afternoon of that day, and requested him, if he had any reason to apprehend that she was suffering, to examine and prescribe for her. The mother denied the truth of this statement in her testimony, and insisted that she mentioned, in the defendant's presence, that her daughter had injured herself, but did not request him in any contingency to examine or prescribe for her.

William Goss, the father of the prosecutrix, testified, among other things, substantially as follows: There were two rooms down-stairs in his house separated by a partition, and a loft which was entered by a stairway on the outside; the witness and his wife occupied the east room; there was an outside door on the east side of the east room in which the witness and his wife usually slept, and to which the defendant was shown on that night; and there was an outside door on the south side of the west room in which his daughter Susan slept between a little niece, two years old, and an imbecile sister, sixteen years old; one Smith and one A. J. Parrott slept in the loft over his daughter's room on that night. When the witness went from Nick's house to his own that night, he talked with the defendant for about twenty minutes, when the defendant asked for a drink of whiskey. The witness had some but could not find it, and the defendant went to bed. The witness then went to the house of his wounded son to see him and to ask where the whiskey was, and when the witness left, the door between the room in which the defendant went to bed was bolted and thumb-bolted on the side next to Dr. Nash's bed. The wife of the witness told him where the whiskey was, and returning immediately to his own house, when he opened the outside door he saw the defendant coming out of the girl's room. The defendant said, "Your daughter was coughing, and I went to see what was to pay." The witness said he did not

know anything was the matter; he said she was bad off and needed medicine. The witness took up the lamp and went into her room, followed closely by the defendant. Witness went within four or five feet of the bed. The defendant went up to the bed, took hold of Susan's arm and felt her pulse; Susan was crying at the time, but no words passed between her and the witness. The witness and the defendant then went into the other room, talked for fifteen or twenty minutes and then took a drink; the defendant took another drink. Witness bolted the middle door, and suspecting something, went upstairs, got a lamp and came down as noiselessly as possible, and on looking into the room saw the defendant again out of his bed. The witness wanted to get his gun out of the girl's room to shoot him, but he ran before witness got to the door. The witness called his daughter, made her get up, put on her clothes and go to Nick's house. The defendant got up and walked by her side to Nick's house, and the witness walked behind them about ten feet. The defendant stayed at Nick's until the next morning (Friday) and then left, saying that he would return Saturday morning and cut out the ball from Nick's wound. It was then not far from ten o'clock at night. His daughter did not tell him what the defendant had done till Saturday evening, when Mr. Farrabow came.

Susan, the prosecutrix, testified: "I am the daughter of William Goss and will be eighteen in September next. In May last, Dr. Nash was called to see Nick who was badly shot, and got there between six and seven P. M. I went to bed between nine and ten; slept in a bed with my sister and niece. Did not know when my father and the doctor came into the house. My brother and sister, ten and twelve years old, slept in a trundle-bed in the room in which Nash was put to sleep; the partition door was bolted, and thumb-bolted by one of the children; I told them to bolt the door and went to bed; the first thing I heard was Dr. Nash calling for

me; I answered and he came to my bed; there was no light in the room; I could see him by the light shining from the other room; he felt my pulse and put his hands on my breast and kissed me, and said I was a sweet girl; asked me to get up and go into mother's room; said he had a dose of medicine in there for me; I said I wouldn't do it and didn't want any of his medicine; I pushed his hand away; he played with me and put his finger in me I don't know how far; he said I had womb disease, and I said I was not sick; he stopped because my father came to the east end door and opened it; he then went into mother's room and afterwards came into my room with my father and felt my pulse and the upper part of my chest; there was nothing said at this time by anyone; I was crying because the doctor scared me so, and because I was troubled about my brother; after my father and the doctor went out of my room the door was closed; I did not go to sleep at once; I saw the doctor again that night; he was between the middle door and my bed; no light in my room, but there was a light in mother's room; then my father came to the east end door and the doctor went back into mother's room and jumped in bed; I could see from the position of my bed anyone getting into mother's bed; my father came to the south door and called me, and I opened the door, and he told me to get up and go to Nick's, and I did so; Dr. Nash overtook me on my way and he and I then walked side by side to Nick's, and three or four steps in front of my father; he asked me if I had told my father what he had done (this was said in a low tone); I said no (also in a low tone), I spoke low because I didn't wish to make a disturbance on account of my brother's condition; the doctor said my brother was likely to die at any moment; on Friday I told mother a part of what had taken place and told her the rest on Saturday; and told uncle Farrabow and others on Saturday.

The witness testified to substantially the same thing that William Goss did about what Dr. Nash said in regard to rogues, etc., when William Goss was pulling at the door.

Upon cross-examination, the prosecutrix said: "I had been troubled with a cough for two weeks; when the doctor called me, he said he heard me coughing and came in to see what was the matter; I did not tell him I had a pain in my stomach, and he did not feel my stomach; I didn't have any pain in my side; he didn't say that young ladies sometimes displaced their wombs by running; I can't say how long he played with my breast and my person; he told me I had womb disease; I don't think he let his finger stay in me a minute; I don't know where the rest of his hand was; he played with my person for sometime before he inserted his finger; I told him I was troubled to death about my brother, and *sorter* pushed him away; he spoke to me kindly and treated me gently; did not hurt me; his tone and touch were gentle and kind; did not attempt any violence nor speak harshly, nor treat me rudely, but put his hands on me gently and spoke kindly; said nothing indecent, except that I had womb disease; on our way to Nick's that night after overtaking me he asked me in a low tone of voice if I had told my father what had happened that night; I replied no in a gentle, low voice; the first time I told all about it was on Saturday evening; I was lying flat on my back all the time; he pulled up my skirt and pulled my legs apart very gently and put his finger in me; I have never had connection with Thomas Wheeler, Thomas Roberts or any other man; my father and uncle sent for me to come out to the barn, and my uncle said the doctor had said he must come down there and see what my father was going to do about it; my father asked me about it and I told him a part of it, and my uncle sent for me and said he wanted to hear all of it, and I told him all of it."

The witnesses Lyon, Farrabow and Mrs. Goss testified, and their testimony tended to corroborate William Goss and

Susan Goss, and to contradict the testimony of the defendant afterwards offered.

The defendant testified as follows: " On the 14th of May William Goss met me in the road and told me that his son Nick had been shot in a fight, and he wanted me to go to see him. I got there between sundown and dark. Nick was shot about the second rib, ball passing through his body and lodging near the spine. I attended him till about 11 o'clock, and told Mr. Goss that I was wet and tired and would like to lie down, and Mr. Goss took me up to his house. Just before I s'arted to the house Mrs. Goss said her daughter ran about a mile to the plant-bed, and nearly killed herself, and she wished me to look after her when I went to the house I laid down on the bed and heard some men go up stairs. The door between the two rooms was ajar. Heard some one in the other room complain and cough. I said, ' Miss Susie, is that you making that complaint?' She said, ' Yes, sir.' I dressed and went into the room to her and felt of her pulse. She said, ' I have a pain in my side running down my leg.' I examined carefully and found nothing there. I said, ' I heard the young man who shot your brother was engaged to be married to you.' William Goss came in the outside door. I said, ' Miss Susie seems to be badly frightened, but I think she has only a catch-pain.' All the time I was in Miss Susie's room the men up stairs were laughing and talking. After I smoked I laid down and started to sleep, when some one opened the side door to the girl's room, and I asked who it was, and Goss says, ' It's nobody but me, Goss.' He then went off and got a handful of keys and tried to lock the door. I said there was no danger of my being robbed, and if so, I would leave. He said there was no danger of that, but there was some mighty curious people around there. I then got up and went by myself to Nick's house, who, some one said, was puking. I did not go with Susie nor Mr. Goss. I did not go in her room but one time that night. I did not touch

her breast or put my finger in her or feel of her in any way.
I told Mr. Lyon that I pressed her in the inguinal region;
did not tell him that I put my finger in her.   I ate breakfast
at Nick's.   Smith and Tilly ate there with the family.   I told
them that I would be back Saturday morning to cut the ball
out; he could not bear the shock then.   I did not go, because
I was sick.   I went back on Saturday at eleven o'clock.   I
was taken sick at Mr. Allen's, and Mr. Allen went with me.
I met Mrs. Goss in the yard, and she said I was so long com-
ing they had sent for another doctor, and I need not come
anyway.   I said, 'What is the matter?'   She said I would
find out soon enough.   She implied that I would be hurt if
I did not leave, and I left and went home.   I saw Ferrabow
on Saturday morning, and having heard some rumors, I went
to his house about twelve o'clock and called him out and took
him to my office, and said nothing to him until I got there.
I told him that I went to Goss' and they were mad with me;
that I heard rumors along the road that I thought showed
them to be bad people.   I asked him to go and see the Gosses,
and then told him all about it.   I did not say if he could not
compromise it I would leave the State.   I saw Ferrabow
again with Harrison Wheeler at my house that evening.
Ferrabow said, 'They will put you in the penitentiary for ten
years; they have got you now, they have got you now.'   I
said, 'You astound me.'   Wheeler said they were talking a
great deal.   Ferrabow said that I had burglariously entered
the room.   He then said that we must have a settlement, and
hurried home and brought a mortgage and a note, and I
signed it.   I left the State Saturday evening, got to Clarks-
ville at noon on Sunday.   I went to look up some evidence,
not to flee from justice.   Renn said I was charged with rape,
and I said I was glad of it for I had feared another charge.
I did not tell Renn that I had fondled the woman.   I have
been informed that she says I put my finger in it."

On cross-examination the witness said, he was born in Mecklenburg County, Virginia, been ten years in West Virginia, practicing physic and teaching school; went to Nashville, Tennessee, then back to West Virginia, then to Wake County, North Carolina, then to Stem's. Witness stated that he did not know a Mrs. Hunnicutt nor a Mrs. Hubbard in Wake County, and was not accused of taking indecent liberties with them. That there may have been such reports, but he never heard them, and that he did not leave Wake County on that account. Witness said that at times he drank a great deal and made a spectacle of himself. That he did not take the lamp into Susie's room, because it did not occur to him but that he could see. Did not mention womb to her, did not put his finger in her private parts. Mr. Lyon misunderstood him if he said so. Did not go into the room with William Goss. Left Goss and Susan at Mr. Goss' house when he went down to Nick's, and if they came down there it was after he had gone to sleep, for he did not see them. Did not ask Sydney Lyon to go over to Goss' and arrange the matter. Did not use the words adjust, or fix up, or compromise, either to Lyon or Ferrabow. Did not make a proposition to leave the State. Did not give a bond in the sum of five hundred dollars with Duncan Ferrabow and W. H. Jones as my sureties, to leave the State. Ferrabow was his enemy, and he went into a compromise to catch up with him. Did not tell Renn on the train that he had never heard anything derogatory of the girl's character. Did not tell Renn at Stem's that since he had got back he had heard something. Did not tell Adams on Monday that he felt the girl and put his finger in her person. Might have told Adams that it was a bad charge.

The testimony of Mrs. Nash and Miss Mary Graham, offered for defendant, tended to contradict that of Ferrabow and to sustain the defendant. A number of witnesses testi-

fied that William Goss was a man of bad character, and that the character of Susan Goss was not good.

Harrison Wheeler, for defendant, testified, that he knew W. Goss all his life, and that his character was not good; that he was at his house on Saturday after Nick was shot, and he said Nash had promised to come and cut the ball out, and after waiting for some time he said he didn't believe that Nash was coming, and that he was going after Dr. Cozart. Witness said that Nash would come, and Goss said, " If you knew what I know, you would say that he was not coming." After Goss went off after Dr. Cozart, Nash came, and Mrs. Goss ordered Nash to leave, but witness didn't hear what she said. Ferrabow came before the ball was taken out. Witness did not hear Mrs. Goss or Susie complain. Goss said Nash came out of the room of his daughter, and told him his daughter was coughing and he went in to see what was the matter; that he mistrusted and went off and came back, and Nash was standing near the fire-place with some medicine. He tried to lock the door but could not, and said that the doctor said if there were rogues about there he would go home. After the ball was cut out, Ferrabow called Susan out to the barn. I was there with her father and mother. She said that Nash had come into her room and asked her to get up and come into his room and take a dose of medicine, and that was all she said. She did not say that Nash had handled her breasts or other parts. I then went to Nash with Ferrabow and he said, " I went down and am now ready to report." Nash said " What of it?" Ferrabow said it was bad—worse than he thought, and Nash denied it all. Susan's general character was not good for chastity—not good 14th of May, 1891. Upon being recalled, the witness Wheeler stated that William Goss said if Nash had come and cut out the ball, as he promised, he would of let the thing drop.

Three physicians, Dr. J. W. Booth, Dr. Pat Booth and Dr. J. M. Hayes, testified that if a woman was lying on her

back, a man could not get his finger into her vulva without violence, if the knees were together, unless she was very bow-legged. Several witnesses also testified to the good character of both William and Susan Goss.

Defendant requested the Court to charge the jury, in addition to other propositions, as follows:

2. If defendant put his hand on the person of Susan with intent only to examine her as a physician, and with no intent to take indecent liberties with her, then defendant is not guilty of any assault, and the jury will return a verdict of not guilty.

3. If defendant put his hands on the person of Susan with her consent, and not against her will, the defendant is not guilty of any assault, and the jury will return a verdict of not guilty,

The Court gave the instruction embraced in the first proposition, but refused the other request, and told the jury that "if Dr. Nash went to Susan's room and to her bed, and with the desire to gratify any morbid curiosity, or to have to do with her, or for any other unlawful purpose, felt her breast or private parts, he is guilty, and it will be your duty to convict. If you find from the facts that defendant took advantage of his position as a physician, and as such, and with a bad purpose, felt the person of Susan, by pretending he would see if she had womb disease, you will find defendant guilty, even if she made no resistance, but consented to the same. But if defendant went in the room of Susan and put his hands on her person with no intent to take indecent liberties with her, but in good faith at the request of Mrs. Goss, or because he thought she was sick and needed his attention, and in good faith put his hands on her to examine her, he would not be guilty, and you will so find."

At a later stage of the charge the Judge added the following: "So that, the question comes back again to what the Court has already charged you,—'Did defendant do what he

did to Susan in good faith as her physician, or did he handle her person for a bad or unlawful purpose? If he acted in good faith as a physician, and did what he did as such, he is not guilty, *otherwise he is guilty.*' "

The question being only whether there was evidence to show consent obtained otherwise than fraudulently, it is unnecessary to set out all the evidence for the State.

The defendant was convicted of a simple assault, and it was adjudged that he be confined in the county jail for a term of two years, from which judgment he appealed.

*The Attorney General* and *Messrs. T. B. Womack* and *J. W. Graham,* for the State.

*Messrs. L. C. Edwards, B. S. Royster* and *J. T. Strayhorn,* for defendant.

AVERY, J.—after stating the facts: If it be conceded that where a physician induces a female to submit to an examination of her person, by the false and fraudulent representation that he is putting his hands upon her in good faith, for the purpose of diagnosing and treating a disease, when in fact his object is only to gratify a licentious desire, he is equally guilty, in contemplation of law, with one who takes the same liberties against her consent, and with the avowed intention of gratifying his lusts, it is none the less a sound proposition of law, that whether the person charged with the assault be a physician or not, he may successfully meet such a charge by showing to the satisfaction of the jury that, without resorting to falsehood or deception, he had the consent of a girl seventeen years old to put his hand upon her person as he did. Whether his intention was to desist after fondling her or to have carnal intercourse with her, if she should continue to yield to him, he was not guilty if her consent was gained otherwise than by using his professional character to practice a fraud.

There was serious conflict in the testimony of the prosecu-
trix and the defendant as to what the latter actually did and
said at her bedside.   The charge of the learned Judge seems
to have been founded upon the idea that the jury, in passing
upon the facts, were so restricted that they must adopt either
the theory of the State or that arising out of the defendant's
testimony, and were not at liberty to take into consideration
the whole of the evidence and predicate their finding upon an
hypothesis not entirely consistent with the theory advanced
or the testimony offered in support of it by either the prose-
cution or the defence.   Counsel may have contended before
the jury that another witness corroborated the testimony of
the plaintiff to the extent of showing that the mother of the
prosecutrix had expressed apprehension as to the conse-
quence to her daughter of over-exertion on the previous after-
noon.   The jury may have concluded that, under the honest
belief that the prosecutrix was suffering, and with the *bona
fide* purpose of relieving her, the defendant first entered her.
room, but that, subsequently, on discovering a willingness on
her part to submit to liberties, that, as she must have known,
constituted no part of a legitimate medical or surgical examina-
tion, he determined to go further and did so with her assent
plainly indicated.   It appeared that two men, sleeping in the
loft just above her, heard no outcry nor loud remonstrance,
and the prosecutrix did not say that she called for anyone;
yet, though she told the defendant that she was not sick,
needed no attention and pushed his hand away, she submit-
ted, without objection made in a tone sufficiently loud to be
heard in the loft, to liberties, accompanied by expressions of
endearment and solicitations to go with him into the adja-
cent room, that counsel may have argued were inconsistent
with the idea that she yielded only because he was conduct-
ing an examination as a physician authorized by her mother.
The jury might have been influenced, too, by the fact that
the father of the prosecutrix appeared, according to her tes-

timony, at the door and saw the defendant going out of her room twice; that he subsequently neither asked nor received a full explanation from his daughter for nearly two days after, though he ordered her to dress and go to his son's house on that night. The rule laid down by Wharton (Cr. Law, § 1156) is, that proof of the assent of the woman, given in ignorance of the fraud that was being practiced by the medical man, where the physician, under pretence of examination, has sexual intercourse, will not constitute a defence to the charge of assault. The principle was first established in the cases of *Rex* v. *Stanton,* 1 Car. & K., 415, and *Rex* v. *Case,* 4 Cox C. C., 220. In the latter case the instruction given by the recorder and approved by the Court, was "that the girl *was of age to consent, and if they thought she had consented to what the prisoner had done,* they ought to acquit the prisoner, but if they were of opinion that she was *ignorant* of the nature of the prisoner's act and made no resistance, solely from the belief that she was submitting to medical treatment, they ought to find him guilty." In that case the physician actually had carnal intercourse with a girl of fourteen, who had been placed under his care by her parents for medical treatment.

We think that the questions whether the prosecutrix consented after being kissed and told that she was a sweet girl (even conceding the truth of her own statement) to the still greater liberties with her person, which she testifies that the defendant took, and whether, if she did consent, she was influenced to yield solely because she thought the defendant was making a medical examination of her person at the request of a parent, should have been fairly submitted to the jury; as, in *Rex* v. *Case,* the Judge ought to have told the jury that, in one view of the evidence, the defendant was not guilty, as well as that in the other view, he was guilty of an assault. In *Rex* v. *Case* it seemed to have been conceded, or not seriously disputed, that the girl of fourteen was

innocent, and did not understand what the physician was doing. In the case at bar there was evidence tending to show that the prosecutrix was not of good character, and it was admitted that she was in her eighteenth year. The defendant had a right to demand that the attention of the jury should be directed to the question whether she understood the manifest purpose of one who kissed and fondled her, and knew that his conduct was not that of a physician making a medical examination in good faith, but still submitted quietly until her father appeared upon the scene. But in response to the requests of the defendant, the Judge embodied his instruction upon this point in two or three propositions, culminating in the sentence: " If he acted in good faith as a physician, and did what he did as such, he is not guilty; *otherwise, he is guilty.*" So that the jury were not left at liberty to reach the belief, from the evidence, that though the defendant was not in good faith examining the prosecutrix as a physician, still that she understood and assented to what he did, or that she understood that he was putting his hands upon her with the purpose of gratifying his lusts, and made no objection because she was indifferent or ready to submit to what he did, if not to still greater liberties.

Without adverting to the other exceptions, either to the admission of testimony or to the charge, and deciding questions that may not be raised upon another trial, it is perhaps best to advert to the exception to the judgment of the Court. We think that there was error in imposing greater punishment than a fine of fifty dollars or imprisonment for thirty days, when the defendant was found guilty of a simple assault only. In all of the cases cited by the Attorney General in support of the judgment, this Court laid stress upon the fact that the person assaulted suffered great bodily pain, though the physical injury did not prove permanent. In *State* v. *Shelly*, 98 N. C., 673, the opinion rested upon the

ground that " the injury was not simply painful and humiliating, but disfigured the face seriously, bruised the eyes, closed one of them entirely and probably permanenty impaired the sight," and, therefore, that *serious damage* was done. The facts in *State* v. *Roseman,* 108 N. C., 765, were that a female prisoner was whipped by a jailer with a buggy whip, so as to cut the flesh on her back and arms. In *State* v. *Huntley,* 91 N. C., 621, though the Court seems to have taken into consideration the mental anguish of the injured party, the reason for sustaining the jurisdiction of the Superior Court, which is made most prominent, was, that the physical suffering of the injured party " must have been severe for a day or two and more or less severe for several days." So that in every instance it has been declared essential, in order to give the Superior Court jurisdiction, that the bodily pain caused by the assault should be severe, if not permanent. The fact that in any given case the person injured must have endured mental anguish may aggravate the offence, but cannot, in the absence of physical injury giving rise to great bodily pain, constitute, within the meaning of the statute, " serious injury." There was no evidence in our case tending to show that the prosecutrix suffered from bodily pain at all. The cases cited are distinguishable from that at bar in the fact that the jury found that the defendant was guilty of the offence charged in the indictment, which was within the jurisdiction of the Superior Court. In our case the defendant was found guilty of a simple assault only, and the jurisdiction of the Court is sustained on the ground that it is included in the higher offence with which he was charged.

For the error pointed out, the defendant is entitled to a new trial.

Error.